# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

45 DIGITAL DEVICES CURRENTLY LOCATED AT 601
4TH STREET NORTHWEST, WASHINGTON, D.C.

)
)
)
)

Case No. 21-SW-122

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846, §§ 841(a)(1) and 841(b)(1)(C)., § 843(b). | Conspiracy to Distribute Narcotics. Distribution of Fentanyl. Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense. |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Special Agent, Sean Hamblet , FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means).*

Date: _____ 04/26/2021 _____

_____
*Judge's signature*

City and state:  Washington, D.C.

G. Michael Harvey, United States Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means     ☑ Original          ❑ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br><br>*45 DIGITAL DEVICES CURRENTLY LOCATED AT 601 4TH STREET NORTHWEST, WASHINGTON, D.C.* | )<br>)<br>)<br>)  Case No.  21-SW-122<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____ May 10, 2021 _____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ G. Michael Harvey _____ .
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*  ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:      04/26/2021      _____
                                                                                *Judge's signature*

City and state:      Washington, D.C.      G. Michael Harvey, United States Magistrate Judge
                                                                                *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-SW-122 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____


_____
*Executing officer's signature*


_____
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched are the following devices (collectively, the **TARGET DEVICES**):

| Item # | Seized from residence of: | FBI Evidence #: | FBI Assigned Barcode: | Description: |
|---|---|---|---|---|
| 1 | OLATUNJI DAWODU | 1B169 | E4309444 | iPhone 5 pink in color |
| 2 | OLATUNJI DAWODU | 1B170 | E4309445 | HP Laptop SN: 5CD051FQJR |
| 3 | OLATUNJI DAWODU | 1B171 | E4309446 | Black LG phone |
| 4 | OLATUNJI DAWODU | 1B172 | E4309447 | Ivory in color iPhone 5 |
| 5 | OLATUNJI DAWODU | 1B177 | E4309452 | SD card adapter with microSD card |
| 6 | OLATUNJI DAWODU | 1B179 | E4309454 | iPhone black |
| 7 | OLATUNJI DAWODU | 1B180 | E4309455 | iPhone white |
| 8 | OLATUNJI DAWODU | 1B181 | E4309456 | iPhone with pink back |
| 9 | OLATUNJI DAWODU | 1B183 | E4309458 | Maxtor hard-drive SN: L42FS1RG |
| 10 | OLATUNJI DAWODU | 1B184 | E4309459 | Hard-Drive WD |
| 11 | OLATUNJI DAWODU | 1B185 | E4309460 | HP Laptop SN: CNU912762J |
| 12 | OLATUNJI DAWODU | 1B186 | E4309461 | Logitech thumb-drive |
| 13 | OLATUNJI DAWODU | 1B187 | E4309462 | iPad SN: DMPM79RBF4YH |
| 14 | OLATUNJI DAWODU | 1B188 | E4309463 | LG phone metro PCS SN: 406CYXM988098 |

| 15 | OLATUNJI DAWODU | 1B189 | E4309464 | Hard-drive Western Digital SN: WXG1A1004631 |
|---|---|---|---|---|
| 16 | LUIS SPENCER | 1B190 | E4309465 | Hard-drive SN: 2CAC24VF |
| 17 | LUIS SPENCER | 1B191 | E4309466 | One Mac Book with serial no. C02VP1P2J1WK |
| 18 | LUIS SPENCER | 1B192 | E4309467 | One black Samsung cell phone with IMEI 355357110177636 |
| 19 | LUIS SPENCER | 1B193 | E4309468 | One gray laptop, model GA401I and serial no. L8NRKD02724033H |
| 20 | LUIS SPENCER | 1B194 | E4309469 | One iPhone |
| 21 | LUIS SPENCER | 1B195 | E4309470 | One iPhone |
| 22 | LUIS SPENCER | 1B196 | E4309471 | One iPhone |
| 23 | LUIS SPENCER | 1B197 | E4309472 | One cream colored iPhone |
| 24 | LUIS SPENCER | 1B198 | E4309473 | One silver Samsung laptop with s/n 3ZFB9FGN902771V |
| 25 | LUIS SPENCER | 1B199 | E4309474 | One MacBook with s/n C02MFM1TG085 |
| 26 | LUIS SPENCER | 1B200 | E4309475 | One MacBook with s/n C02DD68NMD6M |
| 27 | LUIS SPENCER | 1B201 | E4309476 | One Ledger Nano S |
| 28 | LUIS SPENCER | 1B202 | E4309477 | One Ledger Nano S on keyloop |
| 29 | LUIS SPENCER | 1B203 | E4309478 | One Ledger Nano S on black lanyard |
| 30 | LUIS SPENCER | 1B204 | E4309479 | One Ledger Nano S box with miscellaneous paperwork |

| 31 | LUIS SPENCER | 1B205 | E4309480 | One Ledger Nano X package with Ledger Nano X inside |
| 32 | LUIS SPENCER | 1B211 | E4309486 | One iPhone with cracked white back |
| 33 | LUIS SPENCER | 1B214 | E4309489 | One iPhone with pink back, model A1687 |
| 34 | LUIS SPENCER | 1B215 | E4309490 | One iPhone with pink back, model A1778 |
| 35 | LUIS SPENCER | 1B216 | E4309491 | One Casio Exilim digital camera |
| 36 | LUIS SPENCER | 1B217 | E4309492 | One black Nikon digital camera |
| 37 | LUIS SPENCER | 1B219 | E4309494 | One tablet computer in case |
| 38 | LUIS SPENCER | 1B220 | E4309495 | One iPhone with cream colored back, model A1586 |
| 39 | LUIS SPENCER | 1B221 | E4309496 | One white iPhone model A1660 |
| 40 | LUIS SPENCER | 1B224 | E4309499 | One iPhone with pink colored back, model A1688 |
| 41 | LUIS SPENCER | 1B225 | E4309500 | One iPad with serial no. F7NNM1LLF196 |
| 42 | LUIS SPENCER | 1B226 | E4309501 | One iPad with serial no. DMQMX63KFK14 |
| 43 | LUIS SPENCER | 1B227 | E4309502 | One iMac computer with s/n C02T954HGF1J |
| 44 | LUIS SPENCER | 1B228 | E4309503 | One black Sony camera |
| 45 | LUIS SPENCER | 1B229 | E4309504 | One black Canon camera |

The **TARGET DEVICES** are currently located at 601 4TH STREET NORTHWEST, WASHINGTON, DC.

## ATTACHMENT B

### *Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 21 U.S.C. § 846 (Conspiracy to Distribute Narcotics), 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Distribution of Fentanyl), and 21 U.S.C. § 843(b) (Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense) (collectively, the "TARGET OFFENSES"), as described in the search warrant affidavit, including, but not limited to:

a.      evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsinghistory, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.      evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the attachment of other devices;

d.      evidence of counter-forensic programs (and associated data) that are designed toeliminate data from the device;

e.      evidence of the times the device was used;

f.      passwords, encryption keys, biometric keys, and other access devices that may benecessary to access the device;

g.      applications, utility programs, compilers, interpreters, or other software, as well asdocumentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.      records of or information about Internet Protocol addresses used by the device;

i.      records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,search terms that the user entered into any Internet

search engine, and records of user-typed web addresses.

j.  Records and information that constitute evidence of the state of mind of SPENCER or DAWODU, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

k.  Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with SPENCER and DAWODU about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

l.  Records reflecting the use of a Darknet moniker or handle, or other online monikers or pseudonyms, including johncarter7, reflecting the use of vendor or buyer accounts on Darknet marketplaces;

m.  Records concerning the establishment or management of an online or Darknet controlled substance retail business, including documents and other records relating to the creation or hosting of websites, evidence of Darknet or Tor Browser access, merchant accounts for customer transactions, product vendors, invoices, and order forms;

n.  Records concerning financial transactions associated with the operations or proceeds of an online or Darknet controlled substance retail business, including any paper or digital account opening documents, statements, deposit slips, checkbooks, orders or confirmations of wire transfers;

o.  Records of any accounts or transactions within the traditional banking or credit systems or via cryptocurrencies such as Bitcoin;

p.  Digital currency, such as Bitcoin, stored on electronic wallets, other forms of wallets, or other means, cryptocurrency (or digital currency) private keys, and digital currency recovery seeds;

q.  Records relating to any cash-for-bitcoin exchange;

r.  Records of SPENCER's access to the email accounts related to the moniker;

s.  Records relating to the transporting, ordering, purchasing, acquiring, concealing, or distributing of controlled substances;

t.  Records documenting SPENCER's residency, and/or ownership of vehicles;

u.  Records of rental agreements, photographs, personal telephone books,

diaries, envelopes, registration, receipts, and keys which tend to show the identities of the occupants, residents, and/or owners or the locations described in this affidavit;

v.       Records concerning the use of commercial mail receiving agencies and/or post office boxes;

w.       Photographs and/or videos, in particular photographs and/or videos of potential co-conspirators and their criminal associates, assets, and/or controlled substances;

x.       Records relating to the use of and accumulation of proceeds derived from the sale of illegal controlled substances, as well as the acquisition of property obtained from drug proceeds, and items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money obtained from drug sales, including precious metals, jewelry, records of large purchases, receipts, keys and other items tending to establish dominion and control of the location, canceled checks, bank records, credit card records, wire transfers, wire transfer receipts, cashier's checks, cashier's check receipts, addressed mail, express delivery;

y.       Records relating to income derived from the transportation, sales, and distribution of controlled substances, including money orders, wire transfers, cashier's checks and receipts, passbooks, cash cards, gift cards, checkbooks, check registers,

z.       Records of securities, bank statements and other financial instruments, including stocks or bonds in amounts indicative of the proceeds of illicit narcotic trafficking;

aa.      Financial records reflecting expenses incurred in obtaining the items necessary for the transportation and/or distribution of controlled substances, income derived from the sales of controlled substances, legitimate income or lack thereof, and general living expenses;

bb.      Documents indicating travel in interstate and foreign commerce, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

cc.      Records relating to the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including access to shipping materials, packaging materials, and money counters;

dd.      Records of cryptocurrency accounts and wallets;

ee.      Documents and records reflecting the identity of, contact information for,

communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

ff.     Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

gg.     Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

hh.     Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

ii.     Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

jj.     Contents of any calendar or date book; and

kk.     Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| IN THE MATTER OF THE SEARCH OF 45 DIGITAL DEVICES CURRENTLY LOCATED AT 601 4TH STREET NORTHWEST, WASHINGTON, D.C. UNDER RULE 41 FOR POTENTIAL VIOLATIONS OF 21 U.S.C. § 846 |

**Case No. 21-SW-122**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Sean Hamblet, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2008.  I am currently assigned to a Hi-Tech Opioid Task Force and have been so assigned since approximately October 2020.  I have received training in the areas of search and seizure, evidence preservation and collection, interviewing and interrogation techniques, arrest procedures, and cyber investigative techniques, among other topics.

2.     My investigative experience includes, but is not limited to, the use of the following investigative methods:  interviewing witnesses and subjects in criminal cases; use of cooperating witnesses; conducting physical surveillance; supporting undercover operations; consensual monitoring of communications; analyzing financial records; conducting court-authorized electronic surveillance; and applying for, obtaining, and serving search warrants. Through my investigative experience I have become familiar with techniques commonly utilized by individuals or groups leveraging the Internet, Darknet, and other technologies to facilitate the trafficking of opioids and other illicit narcotics, and the laundering of the proceeds of such criminal activity to disguise the source of the proceeds, or to avoid financial institution reporting requirements.

3.     Since this affidavit is being submitted for the limited purpose of obtaining search

warrants, I have not set forth every fact learned during this investigation. Facts not set forth herein are not being relied upon in this affidavit in support of the warrants. I make this affidavit based, in part, on my personal knowledge and observations derived from my participation in this investigation, information provided by other agents and law enforcement officers, reports and data provided by other agents and officers, which I have read and reviewed, and, in part, upon information and belief.

4.      I make this affidavit in support of applications under Rule 41 of the Federal Rules of Criminal Procedure a for search warrant for the following devices seized from **LUIS SPENCER's** and **OLATUNJI DAWODU's** residences on February 23, 2021, pursuant to federal search warrants, which were signed by the Honorable Jared Strauss, United States Magistrate Judge, Southern District of Florida (21-MJ-6088-Strauss and 21-MJ-2089-Strauss, signed on February 18, 2021), (collectively, the **TARGET DEVICES**):

| Item # | Seized from residence of: | FBI Evidence #: | FBI Assigned Barcode: | Description: |
|---|---|---|---|---|
| 1 | OLATUNJI DAWODU | 1B169 | E4309444 | iPhone 5 pink in color |
| 2 | OLATUNJI DAWODU | 1B170 | E4309445 | HP Laptop SN: 5CD051FQJR |
| 3 | OLATUNJI DAWODU | 1B171 | E4309446 | Black LG phone |
| 4 | OLATUNJI DAWODU | 1B172 | E4309447 | Ivory in color iPhone 5 |
| 5 | OLATUNJI DAWODU | 1B177 | E4309452 | SD card adapter with microSD card |
| 6 | OLATUNJI DAWODU | 1B179 | E4309454 | iPhone black |
| 7 | OLATUNJI DAWODU | 1B180 | E4309455 | iPhone white |
| 8 | OLATUNJI DAWODU | 1B181 | E4309456 | iPhone with pink back |
| 9 | OLATUNJI DAWODU | 1B183 | E4309458 | Maxtor hard-drive SN: L42FS1RG |
| 10 | OLATUNJI DAWODU | 1B184 | E4309459 | Hard-Drive WD |
| 11 | OLATUNJI DAWODU | 1B185 | E4309460 | HP Laptop SN: CNU912762J |
| 12 | OLATUNJI DAWODU | 1B186 | E4309461 | Logitech thumb-drive |

| 13 | OLATUNJI DAWODU | 1B187 | E4309462 | iPad<br>SN: DMPM79RBF4YH |
|---|---|---|---|---|
| 14 | OLATUNJI DAWODU | 1B188 | E4309463 | LG phone metro PCS<br>SN: 406CYXM988098 |
| 15 | OLATUNJI DAWODU | 1B189 | E4309464 | Hard-drive Western Digital<br>SN: WXG1A1004631 |
| 16 | LUIS SPENCER | 1B190 | E4309465 | Hard-drive<br>SN: 2CAC24VF |
| 17 | LUIS SPENCER | 1B191 | E4309466 | One Mac Book with serial no.<br>C02VP1P2J1WK |
| 18 | LUIS SPENCER | 1B192 | E4309467 | One black Samsung cell<br>phone with IMEI<br>355357110177636 |
| 19 | LUIS SPENCER | 1B193 | E4309468 | One gray laptop, model<br>GA401I and serial no.<br>L8NRKD02724033H |
| 20 | LUIS SPENCER | 1B194 | E4309469 | One iPhone |
| 21 | LUIS SPENCER | 1B195 | E4309470 | One iPhone |
| 22 | LUIS SPENCER | 1B196 | E4309471 | One iPhone |
| 23 | LUIS SPENCER | 1B197 | E4309472 | One cream colored iPhone |
| 24 | LUIS SPENCER | 1B198 | E4309473 | One silver Samsung laptop<br>with s/n 3ZFB9FGN902771V |
| 25 | LUIS SPENCER | 1B199 | E4309474 | One MacBook with s/n<br>C02MFM1TG085 |
| 26 | LUIS SPENCER | 1B200 | E4309475 | One MacBook with s/n<br>C02DD68NMD6M |
| 27 | LUIS SPENCER | 1B201 | E4309476 | One Ledger Nano S |
| 28 | LUIS SPENCER | 1B202 | E4309477 | One Ledger Nano S on<br>keyloop |
| 29 | LUIS SPENCER | 1B203 | E4309478 | One Ledger Nano S on black<br>lanyard |
| 30 | LUIS SPENCER | 1B204 | E4309479 | One Ledger Nano S box with<br>miscellaneous paperwork |
| 31 | LUIS SPENCER | 1B205 | E4309480 | One Ledger Nano X package<br>with Ledger Nano X inside |
| 32 | LUIS SPENCER | 1B211 | E4309486 | One iPhone with cracked<br>white back |
| 33 | LUIS SPENCER | 1B214 | E4309489 | One iPhone with pink back,<br>model A1687 |

| 34 | LUIS SPENCER | 1B215 | E4309490 | One iPhone with pink back, model A1778 |
| 35 | LUIS SPENCER | 1B216 | E4309491 | One Casio Exilim digital camera |
| 36 | LUIS SPENCER | 1B217 | E4309492 | One black Nikon digital camera |
| 37 | LUIS SPENCER | 1B219 | E4309494 | One tablet computer in case |
| 38 | LUIS SPENCER | 1B220 | E4309495 | One iPhone with cream colored back, model A1586 |
| 39 | LUIS SPENCER | 1B221 | E4309496 | One white iPhone model A1660 |
| 40 | LUIS SPENCER | 1B224 | E4309499 | One iPhone with pink colored back, model A1688 |
| 41 | LUIS SPENCER | 1B225 | E4309500 | One iPad with serial no. F7NNM1LLF196 |
| 42 | LUIS SPENCER | 1B226 | E4309501 | One iPad with serial no. DMQMX63KFK14 |
| 43 | LUIS SPENCER | 1B227 | E4309502 | One iMac computer with s/n C02T954HGF1J |
| 44 | LUIS SPENCER | 1B228 | E4309503 | One black Sony camera |
| 45 | LUIS SPENCER | 1B229 | E4309504 | One black Canon camera |

5.      The **TARGET DEVICES** are currently located at the Federal Bureau of Investigation office located at 601 4th Street Northwest, Washington, District of Columbia.

6.      As detailed below, the FBI, in partnership with other law enforcement agencies, is conducting a criminal investigation of a drug trafficking organization that distributes illicit narcotics, specifically pressed pills containing fentanyl, in person and via the United States Postal Service ("USPS"). The criminal organization advertises the illicit narcotics via Darknet markets using the moniker "johncarter7" and, in some cases, uses online communication platforms to facilitate the sale of said narcotics. With respect to the advertisements of illicit narcotics on the Darknet, the criminal organization is known to have accepted online orders, received payment for these orders in Bitcoin, and mailed the orders to the recipients via the USPS. In-person sales are

known to have been paid for in cash.  It is believed that both **SPENCER** and **DAWODU** coordinated, processed, packaged, and mailed orders.

7.     Law enforcement is also investigating **DAWODU**'s involvement in a related conspiracy using another moniker, "PolarSprings."  PolarSprings was similarly shipping pills pressed with fentanyl using the U.S. Postal Service from locations in and around Providence, Rhode Island.

## I.     PROBABLE CAUSE

### INVESTIGATION OVERVIEW

8.     As described in greater detail below, the FBI's investigation has revealed that multiple individuals, to include, but not limited to, **LUIS TEXEIRA-SPENCER** ("**SPENCER**") and **OLATUNJI DAWODU ("DAWODU")** committed the offenses of Conspiracy to Distribute Controlled Substances, including fentanyl, in violation of 21 U.S.C. § 846, Distribution of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense, in violation of 21 U.S.C. § 843(b) (collectively, the "TARGET OFFENSES"), and there is probable cause to believe that within the confines of the **TARGET DEVICES** listed in Attachment A, there exists evidence and instrumentalities of the **TARGET OFFENSES**, as set forth more fully in Attachment B.

9.     The **TARGET DEVICES** were seized from **SPENCER**'s and **DAWODU's** residences in Florida on or about February 23, 2021, pursuant to search warrants.  Law enforcement also seized a large quantity of pressed pills suspected to contain fentanyl from **DAWODU's** residence, as well as shipping materials consistent with the packaging used to ship drug shipments identified during the course of the investigation, as described below.

## JOHNCARTER7 VENDOR ACTIVITY

10.     The FBI, in partnership with other law enforcement agencies, has been conducting a criminal investigation of a Darknet market vendor that operates the moniker "johncarter7." Beginning in approximately February of 2017, johncarter7 operated across a number of Darknet markets, including AlphaBay, Wall Street, Dream, and Empire.

11.     Specifically, johncarter7 advertised for sale oxycodone pills pressed with fentanyl on AlphaBay and Wall Street, and johncarter7 advertised the sale oxycodone pills on Dream and Empire.  The advertisements on Dream and Empire are similar to the advertisements on AlphaBay and Wall Street; however, the word fentanyl is removed from the listing.[1]  Examples of the listings are detailed in the following paragraphs.

12.     On the Wall Street Market, johncarter7 advertised for sale "oxycodone M30 best in the market." The listing further described that "these pills are pressed with just the right amount of fentanyl no hot spots to overdose solid product all the way around I been around for years since alpha bay days those that know me same product as before MONEY BACK GUARANTEE."

13.     The reference by johncarter7 on Wall Street Market to the "alpha bay days" is a reference to the vendor historically operating on the AlphaBay Market.  When the AlphaBay Darknet market was taken down, law enforcement seized the computer servers that were used to operate AlphaBay. Based on a review of data on that server, johncarter7 was operating as a vendor on AlphaBay since 2017.  The profile advertised the sale of oxycodone pressed with fentanyl, in quantities ranging from 10 to 2,000 pills.  The listings stated that the product was "oxycodone v 4812 30MG pressed with Fentanyl 0.8 MG which is equal 100MG OXY as active substance. The

---

[1] Dream and Empire Markets purported to ban sales of fentanyl and to ban advertisements listing fentanyl.  As described further below, although johncarter7's ads could comply with the purported "ban," by using the same moniker and referencing his earlier sales history johncarter7 could nonetheless effectively communicate to potential customers that the johncarter7 continued to sell fentanyl as part of its pressed pills.

product has accurated dosage [ no hot spot ]....”  The description continued, stating: “it can be used IV / oral / snort . . . shipping from U.S to U.S only.”  Records on the AlphaBay server reveal that johncarter7 completed hundreds of orders of oxycodone pills pressed with fentanyl while operating as a vendor on AlphaBay.

14.     Law enforcement reviewed johncarter7’s Pretty Good Privacy (“PGP”) public keys on his/her vendor accounts on Dream, Wall Street, and Empire Marketplaces.  PGP encryption, while having various legitimate uses, is also used by dark web vendors to encrypt their communication with customers. When a user creates a PGP encryption key, the user is provided a public and private key. Dark web vendors advertise their public keys on marketplaces as a way for customers to encrypt messages sent to them, while keeping their private keys secret to be used to decrypt the messages. As dark web markets have been disrupted over the past few years and vendors forced to create new accounts on new markets, use of the same public PGP key across markets is considered the best way for a vendor to prove that the vendor is who the vendor purports to be, as only the true vendor would have access to the private key

15.     Law enforcement decoded the PGP public keys for johncarter7 on Dream, Wall Street, and Empire Marketplaces, which were identical and identified the same email address (berriesnation1999@gmail.com) embedded in the PGP public key for the vendor accounts on each of the three markets.   The common PGP public key confirms the connection that the vendor was consistent across the different markets.  As detailed below, law enforcement has obtained records related to the common email account that links back to **SPENCER**.

## UNDERCOVER PURCHASES:
## DREAM, WALL STREET, AND EMPIRE MARKETS

16.     During the course of this investigation, a number of undercover purchases of pills

were made, to include the following purchases made on or about the following dates:

| Date | Market | Pills Ordered | Package Shipped From | Controlled Substance |
|------|--------|---------------|----------------------|----------------------|
| 3/19/19 | Dream | 10 | Providence, RI area | fentanyl and acetyl fentanyl (fentanyl analog) |
| 3/27/19 | Wall Street | 10 | Hallandale Beach, FL | fentanyl and acetyl fentanyl (fentanyl analog) |
| 4/12/19 | Wall Street | 10 | Miami, FL | Fentanyl |
| 6/12/19 | Empire | 20 | Miami, FL | fentanyl and acetyl fentanyl |
| 6/19/19 | Empire | 50 | Miami, FL | fentanyl and acetyl fentanyl (fentanyl analog). |

17.     All the packages from the johncarter7 moniker were shipped via USPS Priority

Mail envelopes. Affixed to the packages were printed labels which displayed return addresses with

fictitious names and addresses.  The manner in which the pills purchased over the various markets

were packaged was similar.  Inside of each USPS Priority Mail envelope was a padded envelope

containing another paper envelope. Inside of the paper envelopes were pills which were either

wrapped in paper, or contained within a vacuum seal type of packaging.

## DIRECT PURCHASES FROM JOHNCARTER7 USING
## JABBER MESSAGING SERVICE

18.     In   April   2019,   johncarter7   posted   a   Jabber   account   username

(johncarter7@xmpp.jp) on the Wall Street vendor page for future orders.  Jabber is an instant

messaging service that enables real-time communication between users.[2]  By posting the Jabber

contact information, johncarter7 allowed customers to make purchases directly from the vendor,

rather than having to place orders through the vendor page.

---

[2] Jabber is a Japanese company owned and operated by HAMANO Tsukasa.

19.     In late April of 2019, undercover officers began communicating with johncarter7 using the Jabber account and arranged multiple purchases of narcotics, including the following purchases made on or about the following dates:

| Date | Pills Ordered | Controlled Substance |
|------|---------------|----------------------|
| 4/24/19 | 10 | fentanyl and acetyl fentanyl |
| 5/8/19 | 20 | fentanyl and acetyl fentanyl |
| 5/14/19 | 10 | fentanyl and acetyl fentanyl |
| 6/28/19 | 20 | results pending |
| 7/15/19 | 20 | fentanyl and acetyl fentanyl |
| 9/12/19 | 20 | Heroin |
| 12/9/19 | 30 | fentanyl and heroin |
| 1/17/20 | 10 grams of MDA | 1,3-Benzodioxol-5-yl)-2-(ethylamino)butan-1-one (Eutylone) Hydrochloride |

20.     Each of the packages purchased using the Jabber messaging application contained pills that were packaged in a similar fashion to the undercover purchases from the johncarter7 moniker (described above).  The packages were shipped via USPS Priority Mail envelopes from the Miami, Florida, area.  Affixed to the envelopes were printed labels which displayed return addresses with fictitious names and addresses.  Inside of the USPS Priority Mail envelopes were yellow padded manila envelopes.  Inside of the manila envelopes were white envelopes that contained yellow or white tightly wrapped paper or vacuum seal plastic.  Inside of this packaging were the light blue pills.

**FLOW OF PROCEEDS OF NARCOTICS SALES**

21.     Through the course of the investigation, the FBI was able to obtain numerous Bitcoin addresses used by johncarter7.  For example, after AlphaBay and Wall Street were taken down, law enforcement was able to review the AlphaBay and Wall Street servers, which contained records of johncarter7's Bitcoin addresses.  Johncarter7 also provided Bitcoin addresses during direct undercover purchases via Jabber. Analysis of the illicit proceeds from narcotics sales via

AlphaBay, Wall Street, and direct undercover purchases revealed that a portion of the proceeds were transferred to virtual currency accounts associated with **SPENCER**.

22.     Analysis of AlphaBay Bitcoin addresses associated with johncarter7 revealed the proceeds from illicit purchases conducted by johncarter7 were withdrawn to a Bitcoin address ending in 4MW9.   A query of publicly available information revealed approximately 106 additional Bitcoin addresses that were linked to the address ending in 4MW9, to include an address ending in 5B7c. Further analysis revealed this address deposited approximately .2625558BTC to a Coinbase address ending in xjx7 on or about May 27, 2017.   Coinbase is a registered cryptocurrency exchange that allows users to buy and sell cryptocurrency.   Records provided by Coinbase revealed the deposit was used to process a payment to Expedia for order number M8VU9VRN. Expedia records revealed the Bitcoin was used to secure a hotel reservation in Fort Lauderdale, Florida:  the traveler name and phone number were listed as **LUIS SPENCER**, 401-288-8451, with an associated email address of jizzlemusik@gmail.com.  Further records have been obtained by law enforcement connecting **SPENCER** to the -8451 phone number and to the "jizzlemusik" gmail address.

23.     Additionally, there were numerous transfers from the AlphaBay Bitcoin addresses associated with johncarter7 to other Bitcoin addresses. Tracing of these addresses by law enforcement revealed they were connected to deposits of approximately $20,000 worth of Bitcoin that was transferred to a Bitcoin address at Binance on or around December 31, 2017.[3]

---

[3] Binance is a global cryptocurrency exchange that provides a platform for trading more than 100 cryptocurrencies.

24.     During the undercover purchase on June 28, 2019, johncarter7 provided the FBI undercover employee a Bitcoin address ending in LmNP to make the payment for the illicit narcotics.  Analysis of the Bitcoin address revealed a transfer from the address ending in LmNP on June 29, 2019 to an account at Binance.

25.     During the undercover purchase on December 9, 2019, johncarter7 provided the FBI undercover employee a Bitcoin address ending in DWYF to make the payment for the illicit narcotics.  Analysis revealed several transfers from the Bitcoin address ending in DWYF to several other Bitcoin addresses with a subsequent transfer to an account at Binance.

26.     Binance records revealed the transactions outlined in the three previous paragraphs were sent to an account registered with the email address jizzlemusik@gmail.com. A subsequent review of the login information for the Binance account revealed approximately more than one hundred logins between approximately April 22, 2018, and January 27, 2020, from a Comcast IP address ending in 14.167.  Records provided by Comcast revealed the IP address was assigned to account number ending -8305, in the name of **LUIS SPENCER**, with an account jizzlemusik@comcast.net, with a service address of 405 SE 4th Terrace, Dania Beach, Florida 33004.[4]

---

[4] Law enforcement conducted surveillance operations in the area of 405 SE 4th Terrace and observed SPENCER at the address on multiple occasions.  SPENCER appeared to vacate that residence in or around May 2020.  As detailed below, SPENCER subsequently moved to 1924 NW 2nd Avenue, Wilton Manors, Florida (the location of the search warrant).

## SPENCER'S CONNECTION TO EMAIL CONNECTED TO
## JOHNCARTER7 PGP PUBLIC KEY

27.     As noted above, *see* paragraph 15, the same email – berriesnation1999@gmail.com

– was embedded within the PGP public keys for johncarter7 on Dream, Wall Street, and Empire.

Law enforcement obtained records from Google related to the email address and identified a

number of items linking the account to **SPENCER**.   Specifically, within the emails, law

enforcement observed emails related to activity on LocalBitcoins.com.  The LocalBitcoins account

"johncarter777" reflected trade history with Witness #1.   Witness #1 had previously been

interviewed by law enforcement and was able to identify a photograph of **SPENCER** and knew

**SPENCER** by nickname (he did not know his full name).  Witness #1 advised that he/she had met

**SPENCER** and conducted in-person trades of cash for bitcoin.  Witness #1 had a saved contact

on his/her phone within the Telegram application of "LBC johncarter777" and advised that the

contact was the same individual who he/she had identified in the photograph.

28.     Records from LocalBitcoins for the johncarter777 account include the email

address associated with the account as berriesnation1999@gmail.com (the email address

embedded within the PGP key for johncarter7).

## SURVEILLANCE OF DAWODU AND SPENCER

29.     During the course of the investigation, law enforcement conducted surveillance on

**SPENCER** in the Miami, Florida, area. During the surveillance, law enforcement observed

**SPENCER** on multiple occasions meeting with **DAWODU** at a fishing pier in Dania Beach,

Florida.  In addition, **DAWODU** was also observed on multiple occasions at **SPENCER**'s then

residence (405 SE 4th Terrace, Dania Beach, Florida 33004).  Based on a review of **SPENCER**'s

phone records, **SPENCER** had extensive phone contacts with **DAWODU**.  From the toll records,

law enforcement observed approximately 1,496 phone calls between **SPENCER** and **DAWODU**

from June 17, 2019 to November 15, 2020.

30.     On or about July 15-17, 2019, law enforcement conducted surveillance of **DAWODU**, who was driving a 2007 Gold G35 Infiniti which was registered to **DAWODU** at 3400 SW 32 Ave, West Park, FL 33023.  On or about July 17, 2019, law enforcement observed **DAWODU** leave 3400 SW 32 Ave, West Park, FL 33023 with a white plastic bag which appeared to have a square box inside of it.  **DAWODU** entered his vehicle and placed the bag in the front area of the vehicle.  Law enforcement subsequently observed **DAWODU** park near a blue USPS mailbox, located on the corner of NW 1st Avenue and NW 183rd Street, in the parking lot of the Miami Gardens Office Center.  Law enforcement then observed **DAWODU** retrieve a white plastic bag from the vehicle which appeared to contain a square box.  **DAWODU** walked towards the blue USPS mailbox and placed the contents of the white plastic bag, which appeared to be a large USPS shipping box or multiple flat rate envelopes, inside the blue USPS mailbox.  Shortly thereafter, an Inspector with the United States Postal Inspection Service ("USPIS") retrieved two (2) Priority Mail envelopes from the blue USPS mailbox which were similar to the packages **DAWODU** placed inside the mailbox.[5]  Those packages were seized by USPIS for further investigation.  The Priority Mail envelopes were addressed to individuals located in New Haven, Connecticut, and Denver, Colorado.

31.     Law enforcement subsequently contacted the intended recipients of the two packages that had been seized from the USPS mailbox on July 17, 2019.  On or about July 22, 2019, Witness #2 was interviewed by law enforcement in Denver, Colorado.  Witness #2 gave law enforcement consent to search the package addressed to him/her in Denver, Colorado.  The

---

[5] These packages were similar to the packages that had been purchased by law enforcement from the johncarter7 moniker and directly over the Jabber messaging service.

package contained ten (10) blue pills similar to the pills noted above.  Witness #2 gave consent to law enforcement to assume his/her online identity on the Empire Market, which revealed that the ten (10) blue pills had been purchased from johncarter7.

32.     On or about July 25, 2019, Witness #3 was interviewed by law enforcement in New Haven, Connecticut.  Witness #3 gave law enforcement consent to search the package addressed to him/her in New Haven, Connecticut.  The package contained ten (10) blue pills similar to the pills noted above.  Witness #3 advised law enforcement that the pills were purchased from johncarter7 on the Empire Market.

33.     On or about August 27, 2019, law enforcement observed DAWODU arrive at 3400 SW 32 Ave, West Park, FL 33023 while driving a 2007 Gold G35 Infiniti.  DAWODU exited the vehicle and stood near the trunk of the car.  Then, DAWODU left 3400 SW 32 Ave, West Park, FL 33023, driving the 2007 Gold G35 Infiniti and traveled in and around the West Park, Florida, area.  Later, law enforcement observed DAWODU park near a blue USPS mailbox, located on the corner of NW 1st Avenue and NW 183rd Street, in the parking lot of the Miami Gardens Office Center.  Law enforcement observed DAWODU place a white package inside of the blue USPS mailbox.  DAWODU then traveled to 3400 SW 32 Ave, West Park, FL 33023.

34.     After DAWODU left the USPS mailbox area, law enforcement maintained constant surveillance on the USPS mailbox until a postal carrier arrived. FBI agents observed 11 USPS Priority Mail envelopes collected from the USPS mailbox located on the corner of NW 1st Avenue and NW 183rd Street. The mailings had similar packaging and postage labels as the packages previously received from johncarter7 during undercover purchases, and as the packages that were retrieved from the USPS blue mailbox during surveillance on or about July 15-17, 2019. Law enforcement seized one package for further investigation.

35.     Law enforcement subsequently contacted the intended recipient of the package that had been seized from the blue USPS mailbox after **DAWODU** had been observed dropping items at the USPS mailbox on August 27, 2019.  On or about November 20, 2019, Witness #4 was interviewed by law enforcement in Philadelphia, Pennsylvania.  Witness #4 gave law enforcement consent to search the package, but was unable to provide additional details.  The package contained fifty-two light blue pills similar in appearance to the pills purchased during the undercover and Darknet market purchases described above.[6]

## USE OF STORAGE UNIT

36.     On or about August 21, 2019, law enforcement obtained a court authorized search warrant to place a vehicle tracker on a 2007 Gold G35 Infiniti registered to **DAWODU**.  A review of the tracker data revealed DAWODU frequently traveling in the vicinity of the Davie United Warehouse storage facility.  A pole camera was subsequently placed in the vicinity of the storage facility and recording was initiated on or around October 30, 2019.

37.     A review of pole camera footage captured **DAWODU** and **SPENCER** visiting the storage unit repeatedly.[7]  **SPENCER** and **DAWODU** could be seen carrying items in and out of the storage unit on a number of occasions.  On or about April 2, 2020, the pole camera captured **SPENCER** removing a large piano keyboard, sound equipment, a trash can, dry erase board, and other miscellaneous items from the storage unit.  It appeared as if the storage unit was vacated and was no longer being used by **SPENCER** or **DAWODU.**

---

[6] The pills were subsequently submitted to the USPIS laboratory and the test results were positive for fentanyl.

[7] On or around December 3, 2020, a search warrant was issued for six iCloud accounts.  Review of an account believed to have been used by DAWODU revealed a message from SPENCER, which contained the address for the storage unit discussed herein.

38.     On April 20, 2020, law enforcement reviewed the Empire profile for johncarter7 and determined the account was in vacation mode[8]. Law enforcement also noted the vendor account was last online on April 9, 2020.

39.     In late April 2020 and early May 2020, law enforcement conducted physical surveillance at **SPENCER**'s residence in Dania Beach, Florida, which led law enforcement to believe **SPENCER** had moved from Dania Beach to Homestead, Florida.

40.     Law enforcement continued to monitor virtual currency activity associated with **SPENCER**'s Binance account. Records provided by Binance revealed logins to the account on May 08, 2020 and May 29, 2020, from an IP address ending in 167.170. AT&T records revealed the IP address was assigned to an account at 30504 SW 195th Avenue, Homestead, Florida 33030 in the name of D.B.  Property records for this address revealed the residence was partially owned by D.B. and the brother of **SPENCER**'s girlfriend.[9]

### CHS PURCHASE OF PILLS FROM DAWODU

41.     Although johncarter7 had been in vacation mode and was not actively advertising pressed pills for sale, **DAWODU** continued to distribute pills.  For example, on or about May 9, 2020, an FBI Confidential Human Source ("CHS") contacted **DAWODU** via telephone and requested to purchase 100 pills for $1,000. The pills ordered by the CHS were subsequently shipped from the Providence, Rhode Island area to Washington, D.C. via a USPS Priority Mail envelope. The pills were packaged similarly to pills purchased from johncarter7.  The pills were sent to the DEA laboratory for testing. The results are pending.

---

[8] When a vendor goes on vacation mode, the vendor temporarily takes their product offline for the purposes of re-stocking their inventory, catching up with demand, or some other reason, with the anticipation that the vendor will return.

[9] As detailed below, after staying at the home of SPENCER's girlfriend's brother, SPENCER subsequently moved to 1924 NW 2nd Avenue, Wilton Manors, Florida.

42.     On or about May 14, 2020, the CHS met Individual #1 in person in the Providence, Rhode Island area and provided Individual #1 with $1,000 in cash (as payment for the pills). After Individual #1 received the cash, Individual #1 left the area.

43.     On May 18, 2020, a search warrant was issued for historical cell site data, along with other information, pertaining to a T-Mobile number ending in -9559, known to be used by **DAWODU**.  The information provided pursuant to this search warrant showed that the phone interacted frequently with cell phone towers in both Rhode Island and Florida.

44.     Analysis of call records indicate there were approximately 50 calls between **DAWODU** and **SPENCER** in April of 2020, and approximately 29 calls between **DAWODU** and **SPENCER** in May of 2020.

## JOHNCARTER7 ACCOUNT BACK ONLINE

45.     On or about July 15, 2020, the johncarter7 vendor account appeared to have resumed operations. Johncarter7 listed pressed M30 oxycodone pills, crystal MDA, and ecstasy for sale.  On or about July 17, 2020, an FBI undercover employee attempted to purchase two (2) grams of MDA from johncarter7 on the Empire Market.  On July 20, 2020, the order was cancelled after johncarter7 failed to accept the order within three days.

46.     On or about July 20, 2020, an FBI undercover employee ordered two Ecstasy pills from johncarter7 on the Empire Market.  On August 3, 2020, the FBI undercover employee contacted the johncarter7 vendor account requesting a tracking number as the package had not yet been received.  Johncarter7 responded, "hello yes will check usps it was sent out usps is late with evryone packages."  A package was never delivered relating to this order.

47.     On August 5, 2020, law enforcement established surveillance on **SPENCER** and observed him depart 30504 SW 195th Avenue, Homestead, FL 33030, in a white Ford F150.

SPENCER drove to the rear of an Exxon gas station located at 18700 NW 2nd Avenue, in Miami Gardens, FL 33169, at which time SPENCER exited the vehicle with a white trash bag in hand. SPENCER then entered a United States Post Office in Miami Gardens, FL.

48.     Later that day, a United States Postal Inspector reviewed USPS CCTV surveillance video from the post office entered by SPENCER and observed an individual matching SPENCER's description enter the post office lobby. The individual stopped directly in front of the lobby collection boxes, removed several mail pieces from the white trash bag, and deposited them into the lobby collection boxes. The individual then appeared to take numerous flat rate envelopes from the display case and place them in a white trash bag before leaving.  The flat rate envelopes that SPENCER appeared to pick up are consistent with packaging that pills have been shipped in over the course of this investigation.

49.     On or about August 17, 2020, an FBI undercover employee attempted to purchase 25 pills of oxycodone from johncarter7 on the Empire Market. On that same day, the undercover employee received a message indicating the transaction had been cancelled by the vendor with no explanation provided.

50.     On or about August 21, 2020, it appeared that the Empire Market exit scammed.[10] Based on my training and experience, Darknet vendors often migrate to other markets to resume operations; however, to date, law enforcement has been unable to locate an active Darknet vendor using the moniker johncarter7.

51.     A review of logins to the Binance account registered to SPENCER revealed approximately ten logins from an IP address ending in 167.170 between August 1, 2020 and

_____

[10] An exit scam is when an established market stops paying vendors for new and previous sales. The entity will disappear with the vendors and customers' money and shutdown the site.

August 23, 2020.  Based on the above, after **SPENCER** moved from Dania Beach, Florida to Homestead, FL, law enforcement believes **SPENCER** continued to access virtual currency accounts that were previously used to transfer illicit funds.

### DAWODU CONTINUES TO TRAFFIC NARCOTICS

52.     Although johncarter7 remained inactive, **DAWODU** continued to distribute pills to an FBI CHS.  For example, on or about October 1, 2020, the CHS contacted **DAWODU** and requested to purchase 100 pills for $1,000. The CHS met with **DAWODU** in the Attleboro, Massachusetts, area.  **DAWODU** arrived in his vehicle to meet with CHS and handed the CHS the pills in a USPS Priority Mail envelope and left the area.

53.     On or about October 22, 2020, **DAWODU** sent Individual #1 to meet with the CHS to pick up the money. Individual #1 arrived in his/her vehicle at an agreed-upon location in the Providence, Rhode Island, area.  The CHS handed Individual #1 $1,000 in cash as agreed.

54.     Analysis of call records indicate there were approximately 14 calls between **DAWODU** and **SPENCER** in October 2020.

55.     A review of GPS tracking data for the vehicle believed to be used by **DAWODU** (2017 GMC Yukon bearing Florida license plate number LC4TJ) revealed the vehicle traveling in an around the Rhode Island area for most of the month of October, until approximately October 25, 2020, at which time the vehicle traveled south to **DAWODU**'s residence located at 3400 SW 32nd Avenue, West Park, Florida 33023.

### SPENCER MOVES TO 1924 NW 2nd AVENUE, WILTON MANORS, FL

56.     On or about November 3, 2020, law enforcement located a white Ford truck believed to be used by **SPENCER** at 1924 NW 2nd Avenue, Wilton Manors, Florida 33311. Records provided by Florida Power and Light revealed an account registered to **SPENCER**'s

girlfriend, with a phone number ending in –0954, for 1924 NW 2nd Avenue, Wilton Manors, Florida 33311.  On or about November 6, 2020, law enforcement observed **SPENCER** at the residence.

57.     On January 4, 2021, during physical surveillance at 1924 NW 2nd Avenue, Wilton Manors, Florida 33311**, SPENCER** was observed departing the residence in a white Range Rover and driving to 3400 SW 32nd Avenue, West Park, Florida 33023 (**DAWODU's** residence), where he remained for approximately forty minutes. The following day, **DAWODU**'s Yukon made four stops, all in proximity to USPS blue boxes.

### DAWODU CONTINUES TO DISTRIBUTE NARCOTICS

58.     On or about January 7, 2021, an FBI CHS contacted **DAWODU** via WhatsApp and requested to purchase 100 oxycodone pills.  **DAWODU** told the CHS he would be in Rhode Island in a day or two to provide the pills.  The CHS ultimately met with **DAWODU** on January 15, 2021, in a parking lot in South Attleboro, Massachusetts.  The CHS provided **DAWODU** $1,000 in exchange for a package containing pills.

59.     On or about January 25, 2021, an FBI CHS contacted **DAWODU** via WhatsApp and requested to purchase 50 oxycodone pills.  On February 5, 2021, the FBI CHS received a call from **DAWODU** via WhatsApp regarding the pills.  **DAWODU** told the FBI CHS that he had shipped 100 pills and he/she should receive the package on February 7, 2021.  The package was shipped from the USPS post office in Opa Locka, Florida.  GPS tracking data for the 2017 GMC Yukon indicates it was at this post office on February 5, 2021.  Two still images provided by USPIS from the post office in Opa Locka show an individual matching the general description of

**DAWODU** in the post office around the time the package was mailed.[11]  Data from the vehicle

tracker indicates that the 2017 GMC Yukon was at **DAWODU**'s residence (3400 SW 32nd Avenue,

West Park, Florida 33023) before the 2017 GMC Yukon drove to the post office where the package

of narcotics was mailed from.

## PHONE AND DIGITAL DEVICE ACTIVITY

60.     On December 15, 2020, law enforcement obtained authorization to install a pen

register/trap and trace device (PR/TT) for Comcast account ending in 9209, subscribed to E.A., at

3400 SW 32nd Avenue, West Park, Florida 33023.   A review of the data collected between

December 23, 2020, and January 28, 2021, revealed connections with IP addresses associated with

virtual currency exchanges Coinbase.com and Gemini.com, and connections with IP addresses

associated with Tor relays.

61.     On January 1, 2021, law enforcement obtained authorization to install a PR/TT

device for Comcast account ending in 7404, which was subscribed to Claudia Schilling

(**SPENCER**'s girlfriend) at 1924 NW 2nd Avenue, Wilton Manors, Florida 33311.   A review of

recent data collected revealed connections with IP addresses associated with virtual currency

exchange Binance.com on or about January 3, 2021, as well as connections with IP addresses

associated with Tor relays.[12]  This activity is indicative of the use of computers and other digital

devices at the location to access virtual currency and to connect to the Darknet at 1924 NW 2nd

Avenue, Wilton Manors, Florida.

62.     By way of background, law enforcement previously obtained similar records for

---

[11]   Note: Identification of DAWODU would not be possible based on these images alone as they are not of high enough resolution to do so.

[12]   As detailed above in paragraphs 18-22, during two of the undercover purchases, johncarter7 provided the FBI undercover employee with Bitcoin addresses to make the payment for the illicit narcotics.  Analysis of the Bitcoin addresses revealed subsequent transfers from the address to accounts at Binance associated with SPENCER.

**SPENCER**'s residence when he resided in Dania Beach.  A review of this data showed similar activity with connections to the Tor network, as well as connections to the XMPP.JP Jabber server. This is the same communication server that was used by johncarter7 to conduct direct purchases with undercover agents.

63.     On January 3, 2021, **SPENCER**'s Binance account was accessed from an IP address associated with the Comcast account subscribed at 1924 NW 2nd Avenue, Wilton Manors, Florida.

64.     A review of recent phone records regarding phone number ending -8451 (**SPENCER**) showed approximately 68 calls to/from phone number ending -9559 (**DAWODU**) between May 31, 2020, and January 31, 2021.  Of these calls, approximately 4 occurred in December of 2020, and approximately 13 calls occurred in January, with the last call occurring on January 25, 2021.  Additionally, based on a review of iCloud records, **SPENCER** and **DAWODU** also communicate with messaging services that are not captured in toll records.

## REVIEW OF APPLE ICLOUD DATA

65.     On or around December 3, 2020, a search warrant was issued for iCloud accounts related to targets of the investigation, including accounts for **SPENCER** and **DAWODU**.  Review of the data collected under this search warrant, which remains ongoing, has thus far produced evidence of criminal conduct, and has identified additional co-conspirators.

66.     On or about August 20, 2019, the account believed to be utilized by **SPENCER** communicated via iMessage with Individual #2, who **SPENCER** is believed to have used to facilitate the exchange of bitcoin for U.S. dollars.  In the messages, **SPENCER** directed Individual #2 to meet with Witness #1 to collect $3,400 in exchange for bitcoin **SPENCER** planned to send to Witness #1.  **SPENCER** planned to send Witness #1 bitcoin worth approximately $4,000,

according to **SPENCER**'s messages.

67.     On or about March 27, 2020, the account believed to be utilized by **DAWODU** was involved in an exchange with Individual #3, who is believed to be mailing packages for **DAWODU**.   In the messages, **DAWODU** sent a list of six addresses labeled "Drops" to Individual #3.   Research of five of those addresses revealed locations to USPS mailboxes or U.S. Post Offices.[13]   On or about March 31, 2020 Individual #3 sent a message to **DAWODU**, "Anything else going out today/ tomorrow," and provided four screenshots images of U.S. Post Offices in Massachusetts.  On or about April 21, 2020, **DAWODU** texted Individual #3, "Get ready for abt 11 am. 4 stops."

68.     Additionally, **DAWODU**'s account revealed several occasions wherein **SPENCER** sent what appeared to be bitcoin addresses to **DAWODU**.

### SEARCH SPENCER's AND DAWODU's RESIDENCES.

69.     On February 18, 2021, two federal search warrants were signed by the Honorable Jared Strauss, United States Magistrate Judge, United States District Court for the Southern District of Florida:  one for the residence of **SPENCER** located at 1924 NW 2nd Avenue, Wilton Manors, Florida, and the second for the residence of **DAWODU** located 3400 SW 32nd Avenue, West Park Florida.  The FBI, along with other law enforcement agencies, executed the searches on February 23, 2021. During the searches, law enforcement located and seized the **TARGET DEVICES** from the residences, as detailed below and in Attachment A.[14]

---

[13] The sixth address had a correct street for a post office location, but reflected the incorrect city.

[14] The search warrants signed by Judge Strauss authorized the search of the devices seized from **SPENCER** and **DAWODU's** residences.  The devices were subsequently moved to the District of Columbia and your affiant is seeking a warrant for those devices presently located within this District.

70.     On February 23, 2021, law enforcement made entry into **DAWODU's** residence. **DAWODU** was present at the time that law enforcement made entry.  During the search of **DAWODU**'s residence, law enforcement recovered approximately 1,400 grams of pills containing suspected fentanyl (consistent with pills ordered through the darknet markets), as well as approximately 30 USPS mailing envelopes, consistent with those used to ship drugs during the course of the conspiracy.

71.     Additionally, law enforcement recovered the following digital devices from **DAWODU**'s residence:

| Item # | Seized from residence of: | FBI Evidence #: | FBI Assigned Barcode: | Description: |
|---|---|---|---|---|
| 1 | OLATUNJI DAWODU | 1B169 | E4309444 | iPhone 5 pink in color |
| 2 | OLATUNJI DAWODU | 1B170 | E4309445 | HP Laptop SN: 5CD051FQJR |
| 3 | OLATUNJI DAWODU | 1B171 | E4309446 | Black LG phone |
| 4 | OLATUNJI DAWODU | 1B172 | E4309447 | Ivory in color iPhone 5 |
| 5 | OLATUNJI DAWODU | 1B177 | E4309452 | SD card adapter with microSD card |
| 6 | OLATUNJI DAWODU | 1B179 | E4309454 | iPhone black |
| 7 | OLATUNJI DAWODU | 1B180 | E4309455 | iPhone white |
| 8 | OLATUNJI DAWODU | 1B181 | E4309456 | iPhone with pink back |
| 9 | OLATUNJI DAWODU | 1B183 | E4309458 | Maxtor hard-drive SN: L42FS1RG |
| 10 | OLATUNJI DAWODU | 1B184 | E4309459 | Hard-Drive WD |
| 11 | OLATUNJI DAWODU | 1B185 | E4309460 | HP Laptop SN: CNU912762J |
| 12 | OLATUNJI DAWODU | 1B186 | E4309461 | Logitech thumb-drive |
| 13 | OLATUNJI DAWODU | 1B187 | E4309462 | iPad SN: DMPM79RBF4YH |
| 14 | OLATUNJI DAWODU | 1B188 | E4309463 | LG phone metro PCS SN: 406CYXM988098 |
| 15 | OLATUNJI DAWODU | 1B189 | E4309464 | Hard-drive Western Digital SN: WXG1A1004631 |

72.     On February 23, 2021, law enforcement also made entry into **SPENCER**'s residence. **SPENCER** was present at the time that law enforcement made entry.

73.     Law enforcement seized the following items from **SPENCER**'s residence:

| Item # | Seized from residence of: | FBI Evidence #: | FBI Assigned Barcode: | Description: |
|---|---|---|---|---|
| 16 | LUIS SPENCER | 1B190 | E4309465 | Hard-drive SN: 2CAC24VF |
| 17 | LUIS SPENCER | 1B191 | E4309466 | One Mac Book with serial no. C02VP1P2J1WK |
| 18 | LUIS SPENCER | 1B192 | E4309467 | One black Samsung cell phone with IMEI 355357110177636 |
| 19 | LUIS SPENCER | 1B193 | E4309468 | One gray laptop, model GA401I and serial no. L8NRKD02724033H |
| 20 | LUIS SPENCER | 1B194 | E4309469 | One iPhone |
| 21 | LUIS SPENCER | 1B195 | E4309470 | One iPhone |
| 22 | LUIS SPENCER | 1B196 | E4309471 | One iPhone |
| 23 | LUIS SPENCER | 1B197 | E4309472 | One cream colored iPhone |
| 24 | LUIS SPENCER | 1B198 | E4309473 | One silver Samsung laptop with s/n 3ZFB9FGN902771V |
| 25 | LUIS SPENCER | 1B199 | E4309474 | One MacBook with s/n C02MFM1TG085 |
| 26 | LUIS SPENCER | 1B200 | E4309475 | One MacBook with s/n C02DD68NMD6M |
| 27 | LUIS SPENCER | 1B201 | E4309476 | One Ledger Nano S |
| 28 | LUIS SPENCER | 1B202 | E4309477 | One Ledger Nano S on keyloop |
| 29 | LUIS SPENCER | 1B203 | E4309478 | One Ledger Nano S on black lanyard |

| 30 | LUIS SPENCER | 1B204 | E4309479 | One Ledger Nano S box with miscellaneous paperwork |
| 31 | LUIS SPENCER | 1B205 | E4309480 | One Ledger Nano X package with Ledger Nano X inside |
| 32 | LUIS SPENCER | 1B211 | E4309486 | One iPhone with cracked white back |
| 33 | LUIS SPENCER | 1B214 | E4309489 | One iPhone with pink back, model A1687 |
| 34 | LUIS SPENCER | 1B215 | E4309490 | One iPhone with pink back, model A1778 |
| 35 | LUIS SPENCER | 1B216 | E4309491 | One Casio Exilim digital camera |
| 36 | LUIS SPENCER | 1B217 | E4309492 | One black Nikon digital camera |
| 37 | LUIS SPENCER | 1B219 | E4309494 | One tablet computer in case |
| 38 | LUIS SPENCER | 1B220 | E4309495 | One iPhone with cream colored back, model A1586 |
| 39 | LUIS SPENCER | 1B221 | E4309496 | One white iPhone model A1660 |
| 40 | LUIS SPENCER | 1B224 | E4309499 | One iPhone with pink colored back, model A1688 |
| 41 | LUIS SPENCER | 1B225 | E4309500 | One iPad with serial no. F7NNM1LLF196 |
| 42 | LUIS SPENCER | 1B226 | E4309501 | One iPad with serial no. DMQMX63KFK14 |
| 43 | LUIS SPENCER | 1B227 | E4309502 | One iMac computer with s/n C02T954HGF1J |
| 44 | LUIS SPENCER | 1B228 | E4309503 | One black Sony camera |
| 45 | LUIS SPENCER | 1B229 | E4309504 | One black Canon camera |

74.     Following the execution of the search warrant at his residence, **SPENCER** and his girlfriend spoke on a recorded call while **SPENCER** was detained in Broward County, Florida.

75.     In the recorded jail call between **SPENCER** and his girlfriend (who resided with **SPENCER** at the residence where the search warrant was executed) shortly after his arrest, **SPENCER** directed the girlfriend to get rid of laptops that had been inadvertently missed by the FBI during their search of the residence.

76.     Specifically, during the call **SPENCER** asked his girlfriend about a backpack on the floor "with garbage and shit" in it and inquired as to whether law enforcement had taken it. **SPENCER** then further clarified which backpack he was referring to.  His girlfriend then apparently located the backpack **SPENCER** described to her and states "it's right here…there is laptops in here."  His girlfriend appeared to express surprise upon locating the contents of the backpack.  **SPENCER** immediately responded: "get rid of it."

77.     Later during the call, **SPENCER** directed his girlfriend at least two more times to get rid of the backpack.  **SPENCER** also inquired about other specific items were seized during the search warrant, including the ledgers.

78.     On the call, **SPENCER** and his girlfriend also made reference to **DAWODU**'s nickname ("TJ"), as well as to another individual ("Alex" a/k/a **ALEX OGANDO** (detailed below)).

## ARREST OF ALEX OGANDO AND SEARCH OF RESIDENCE

79.     On February 23, 2021, a search warrant was executed at the residence of **ALEX OGANDO**, 58 Felix Street, Apartment 2, Providence, Rhode Island.  The search warrant was based on a related investigation into the involvement of **OGANDO** and **DAWODU** in the operation of another darknet moniker ("PolarSprings") that also sold pills pressed with fentanyl.

80.     The PolarSprings moniker has been active on a number of markets including Wall Street Market, Empire Market, Icarus Market, Deep Sea Market, and ToRReZ Market.  The PGP

keys for the PolarSprings vender accounts on Wall Street, Empire, Icarus, and Deep Sea were the same, indicating it was operated by the same individual or individuals.

81.     The investigation into PolarSprings included five undercover purchases of pills from PolarSprings on Empire Market made between June 2019 and August 2020.  The resulting packages contained blue pills, with three packages later testing positive for fentanyl.  Laboratory results are pending for the other two packages.

82.     After Empire Market was taken down, law enforcement gained access to certain server information pertaining to vendors operating on the market.  This included PolarSprings related bitcoin addresses later determined to be from the same wallet (hereinafter, "PS WALLET"), which were involved in the payment of certain fees paid by the PolarSprings to Empire Market.  Virtual currency tracing of these bitcoin addresses led law enforcement to an individual trading bitcoin (Witness #1) for cash with the individual or individuals in control of PS WALLET.  In one such exchange, bitcoin purchased from Witness #1 on or about March 22, 2019, appeared to be used to fund a vendor fee paid to Empire Market several hours later, on or about March 23, 2019.  Witness #1 was later interviewed by law enforcement and was shown a photograph of **OGANDO** who Witness #1 identified as the person with whom he/she traded in this transaction.

83.     A review of phone records collected in the case indicate a connection between **SPENCER** and **OGANDO,** with approximately 23 calls between them between on or about January 24, 2020, and on or about November 1, 2020.  Additionally, review of iCloud data for an account belonging to **SPENCER** indicates **OGANDO** and **SPENCER** also communicated by instant message.

84.     Surveillance and pole camera footage placed **DAWODU** at **OGANDO**'s residence in late 2020.  **DAWODU** was observed at **OGANDO**'s residence on October 1, 2020, before delivering pills purchased by a CHS, *see* paragraph 52.  **DAWADO** and **OGANDO** were also observed at arriving outside **OGANDO**'s residence on January 14, 2021, in a black 2020 Jeep Wrangler bearing Florida tag PIUI96, registered to **OGANDO** at 3400 SW 32nd Avenue, West Park, Florida 33023, the residence address of **DOWADU**.

85.     During the search of **OGANDO**'s residence, law enforcement seized more than $350,000 in cash and a money counter.

86.     In **OGANDO**'s residence, law enforcement also recovered a piece of paper with the word "P. Springs" at the top.  Under that phrase were a series of unrelated words believed to be a virtual currency wallet seed phrase, which can be used to restore a wallet if one loses access to their wallet. Wallet software will typically generate a seed phrase and instruct the user to write it down on paper. If the user's computer breaks or their hard drive becomes corrupted, they can download the same wallet software again and use the paper backup to get their bitcoins back.

87.     Additionally, paperwork related to **DAWODU**'s vehicle (used to drop packages for Johncarter7), was located inside of **OGANDO**'s residence.

88.     Law enforcement also obtained a search warrant for Apartment 3, an apartment under construction located above **OGANDO**'s residence.  Within that apartment, law enforcement recovered:

- More than 1,770 grams of pills that field tested positive for fentanyl;

- Gloves and packaging materials;

- A note indicating what appeared to be quantities of orders to be filled;

- Approximately 30 USPS Priority Mail envelopes with filled pill orders (pills had been packed in the envelopes, but no labels had yet been affixed) containing an additional approximately 363 grams of suspected fentanyl pills.

89.     **OGANDO** and **DAWODU** had been seen entering **OGANDO**'s residence on or about January 14, 2021, and carrying what appeared to be packages into the residence.

90.     Based on the evidence described above – as well as the fact that the conduct described herein necessarily requires the use of digital devices – your affiant believes that digital devices recovered from the residences of **SPENCER** and **DAWODU** will contain evidence of the narcotics trafficking operation, including evidence of records of payment, communications regarding orders, contacts with co-conspirators, and information regarding shipping and tracking of packages.

## TRAINING AND EXPERIENCE ON THE DARKNET AND DIGITAL CURRENCY AND NARCOTICS TRAFFICKING

91.     Based on my training and experience and familiarity with investigations involving the Darknet and digital currency conducted by other law enforcement agents, I know the following:

a.     Individuals using digital currency, use a variety of digital devices, such as phones and computers.  It is common to use multiple digital devices in order to maintain anonymity and to compartmentalize communication or use encrypted forms of communication in speaking with criminal associates.

b.     Individuals who use digital currency may store their "recovery seed" or "private keys" on digital devices.

c.     Accessing the Darknet can occur by USB or flash-drive device.

92.     Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.     Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.

d.    Drug traffickers often keep contact info for their drug trafficking associates on their digital devices, as well as records of meetings with associates, customers (including in the form of calendar entries and location data).

e.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which often operate on a cash basis.  Such currency is often stored in their residences and vehicles.

f.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep packaging materials and proceeds of drug trafficking in their residences.

g.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and

suppliers.

h.     Drug traffickers often possess firearms and other dangerous weapons to protect
their profits and supply of drugs from others who might attempt to forcibly take
them.

**COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS**

93.     As described above and in Attachment B, this application seeks permission to
search for evidence, fruits, contraband, instrumentalities, and information that might be found
within the **TARGET DEVICES**, in whatever form they are found.  Based on my knowledge,
training, and experience, as well as information related to me by agents and others involved in this
investigation and in the forensic examination of digital devices, I respectfully submit that there is
probable cause to believe that the records and information described in Attachment B will be stored
in the **TARGET DEVICES** for at least the following reasons:

a.     Individuals who engage in criminal activity, including trafficking of
narcotics over the Darknet, use digital devices, like the **TARGET DEVICES,** to access the
Darknet; to manage virtual currency through the use of digital wallets; to photograph pills that can
be used on Darknet sites; to communicate with co-conspirators through calls, messages, email,
voice calling applications, video calling applications, or messaging applications; and to store on
digital devices, like the **TARGET DEVICES,** documents and records relating to their illegal
activity, which can include logs of online chats with co-conspirators, email correspondence, text
or other messages, contact information of co-conspirators, including telephone numbers, email
addresses, identifiers for instant messaging and social medial accounts; to purchase supplies for
packaging and shipping for the narcotics described above; to track shipping and coordinate the
movement of packages; and to communicate with purchasers and suppliers.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

94.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.   Additionally, evidence regarding user attribution for particular accounts may reveal important evidence connecting the defendants to accounts related to the criminal activity under investigation. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often

store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.       Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.       A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.       The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team

and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

       e.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

       f.     I know that when an individual uses a digital device to facilitate the trafficking of narcotics over the Darknet, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

95.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence

of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously

followed.   A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.   Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.   Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.   Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.   For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.     Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected

time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

96.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.     The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether

the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

97.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

98.     I submit that this affidavit supports probable cause for the warrants to search the **TARGET DEVICES** for the information described in Attachment B.

99.     I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully submitted,

_____
Special Agent Sean Hamblet
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on **April 26, 2021.**

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE